UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
DEBRA McSWEENEY and BRIAN SMITH,
Individually and as the Parents and Natural
Guardians of MEGAN SMITH, and MEGAN
SMITH, Individually,

                  Plaintiffs,                **08-CV-4603 (TCP)**

   -against-

                                 **MEMORANDUM**
                                 **AND ORDER**

BAYPORT BLUEPOINT CENTRAL SCHOOL
DISTRICT, BAYPORT BLUEPOINT CENTRAL
SCHOOL DISTRICT BOARD OF EDUCATION,
KERRY VANN, Individually and in her official
capacity as Principal and ANTHONY
ANNUNZIATO, Individually and in his official
capacity as Superintendent,

                  Defendants.
-------------------------------------------------------------X
PLATT, District Judge.

      Before the Court is defendants' renewed motion for summary judgment pursuant to

Federal Rule of Civil Procedure 56 on plaintiffs' complaint.  For the following reasons,

defendants' motion is hereby **GRANTED** as to plaintiffs' claims brought pursuant to 42 U.S.C.

§ 1983 and plaintiffs' Title IX claim.  Plaintiffs' New York State negligence claim is dismissed

without prejudice to renew.

**BACKGROUND**

A.    **Facts**

      The Bayport-Bluepoint Central School district is a public school district comprised of

several schools, including the Academy Street Elementary School ("Academy Street"), with its

principal place of business and administrative office located at 189 Academy Street, Bayport,

New York. Def. 56.1 Stmt. ¶ 1. Defendant Principal Kerry Vann ("Vann") became principal of Academy Street in August 2007.[1] *Id.* at ¶ 2.

During Vann's first year as principal of Academy Street, infant plaintiff MS ("MS") was a fourth grader who claimed that another student, CC ("CC"), harassed her. *Id.* at ¶ 3. Vann reviewed former principals' confidential files, where any complaints regarding student bullying would be maintained, to determine whether there had been any formal complaints or suspensions of CC in the time prior to her tenure as principal. *Id.* at ¶ 4. Vann concluded that no one had complained about CC prior to August 2007. *Id.* at ¶ 5. Consequently, before the start of the 2007 school year, Vann was unaware of any discipline incidents involving CC. *Id.* at ¶ 6.

Plaintiffs have been satisfied with the work of all of MS's teachers in the Academy Street Elementary School and have no complaints in that regard. Def. 56.1 Stmt. ¶ 7. Plaintiffs first sought legal advice from their attorney herein, David Gordon, in March 2008, at which time he referred MS to social worker Barbara DeFeo. Def. 56.1 Stmt. ¶ 8. Gordon referred her to DeFeo because MS was experiencing symptoms allegedly caused by CC's bullying at school. Plt. 56.1 Ctr. Stmt. ¶ 8.

## 1. First Incident Involving CC

Melissa Lynn Danchalski was MS's fourth grade teacher, who was also unaware of any

---

1. In his original Local Rule 56.1(b) counter-statement, plaintiff countered the majority of defendants' 56.1(a) statement by noting that the statements originated from "defendant Kerry Vann in her Affidavit in Support of Defendants' Motion for Summary Judgment and this defendant Vann has never been subjected to any inquiry, deposition, or cross-examination regarding her regarding any of her statements in this action." The undersigned allowed plaintiffs' attorney to depose Principal Vann despite the fact that discovery had closed. In controverting defendants' current 56.1(a) statement, plaintiffs' attorney now resorts to using the phrase "According to defendant Vann." Unsubstantiated opposition, however, does not create a genuine issue of material fact sufficient to defeat a motion for summary judgment. In addition, where any citation in a 56.1(a) or (b) statement does not support the assertion for which it is offered, the Court is free to disregard the statement.

prior disciplinary problems involving CC.  *Id.* at ¶¶ 9, 10.  Initially, MM's parents, Debra McSweeney ("McSweeney") and Brian Smith ("Smith"), did not object to CC and MS being in the same classroom.  *Id.* at ¶ 12.  Nor did plaintiff's parents ever complain to anyone in the district regarding name calling and are unaware if the teachers or district administrators had any knowledge about CC calling MS names.  *Id.* at ¶ 13.  The first incident between MS and CC occurred when CC dropped a book on MS's fingers during the first week of school.  *Id.* at ¶ 11.

MS testified that she knew CC intentionally dropped the book on her finger because "he smiled right after he dropped them."  Plt. 56.1 Ctr. Stmt. ¶ 14, Exh. F, Tr. MS 85:24-86:2.  MS's mother McSweeney called plaintiff's teacher to advise her with regard to the book incident and also advised that CC was "bumping" into MS.  *Id.* at ¶ 15.  The teacher separated the students and allowed MS to sit next to her friend Kelly which made MS happy and which satisfied the parents.  *Id.* at ¶¶ 16-18.

## 2. Second Incident Involving CC

On September 18, 2007, Vann was contacted at the end of the school day, for the first time, with respect to CC harassing MS.  *Id.* at ¶ 19.  Teacher Danchalski approached Vann to advise her that MS claimed that CC stated "I am going to shoot you in the head," which Vann immediately investigated.  *Id.* at ¶¶ 20, 21.  No adults witnessed this incident, which allegedly occurred in gym class.  *Id.* at ¶¶ 22, 23.

McSweeney called Principal Vann at 3:45 p.m. and left her a message regarding the alleged threat made by CC to MS.  *Id.* at ¶ 24.  Vann returned MS's mother's call immediately and was advised that CC threatened MS by saying that "she [sic] was going to egg her house on Halloween and shoot her in the head."  *Id.* at ¶¶ 25, 26.  In her affidavit, Vann swore that she

advised McSweeney that she would take the issue seriously, that she was concerned with MS's safety and well-being and that she would speak to MS to ensure that she felt safe coming to school. *Id.* at ¶¶ 27, 28. McSweeney testified that Vann stated, "you know, it is Halloween, boys will be boys." Plt. 56.1 Ctr. Stmt. ¶ 27, Exh. C. 16:7-8. Vann testified that she did not recall using those words and nor were they words she would use or be allowed to use. Plt. 56.1 Ctr. Stmt. ¶ 27; Exh. L, Tr. Vann 15:17-24.

On the same day, Vann communicated with a Ms. Fuestal ("Fuestal"), the parent to one of MS's friends, to investigate the purported incident because Fuestal's daughter was also involved. Def. 56.1 Stmt. ¶ 29. Fuestal claimed that her daughter heard CC say he was going to "egg MS['s] and Ms. Fuestal's homes on Halloween and shoot them in the head with an air gun." *Id.* at ¶ 30. According to Vann's affidavit, Fuestal advised Vann that her daughter was not upset about the incident and did not feel threatened. *Id.* at ¶ 31. Plaintiffs contend that Fuestal was also upset about the threat, but the exhibit offered does not support their contention. Plt. 56.1 Ctr. Stmt. ¶ 31. Defendants contend that McSweeney also confirmed with Fuestal that the threat involved a "pop gun" and not an actual threat to kill MS. Def. 56.1 Stmt.¶ 32. The exhibits and page numbers offered do not, however, support their contention. Plt. 56.1 Ctr. Stmt. ¶ 32.

Vann advised plaintiff's mother that CC was given consequences for his behavior which she was not at liberty to discuss because they concerned another student and that such a discussion would violate the Family Educational Rights and Privacy Act. Def. 56.1 Stmt. ¶ 33.

On September 19, 2007, the day after the incident, Vann spoke to all of the children involved. *Id.* at ¶ 34. Vann determined that CC did not threaten to "kill" MS, but had said that he was going to shoot her in the head with a toy air gun, which statement was confirmed by MS's

friend and by CC. *Id.* at ¶¶ 35, 36. After concluding her investigation, Vann determined that CC was more interested in teasing the girls than in actually harming them. *Id.* at ¶ 38. As a result of threatening to shoot MS with a toy air gun, CC received lunch detention. *Id.* at ¶ 37. In addition, Vann spoke to CC and his mother at a meeting with Dr. Saylor, the school psychologist, on the morning following the incident. *Id.* at ¶ 39. Plaintiffs contend that Vann accepted CC's version of events over MS's version despite the fact that MS specifically told Vann that CC threatened her with a gun. Plt. 56.1 Ctr. Stmt. ¶ 35.

### 3. Third Incident Involving CC

On November 29, 2007, Brian Smith, MS's father, and her mother, McSweeney, sent a letter by electronic mail ("email") to the Superintendent of Schools, on which Vann was copied. Def. 56.1 Stmt. ¶ 40. As of that date, Vann was only aware of the air gun incident between CC and MS. *Id.* at ¶ 41. The letter alleges that on Halloween, CC was "disruptive" while he was off of school grounds and at plaintiff's residence. *Id.* at ¶ 42. The school had not been advised of this incident previously. *Id.* at ¶ 43. The letter also contends that CC "threatened to kill [MS] with a gun"; that CC continued to bully MS; that MS, who formerly loved school, was now coming home crying due to CC's bullying. Plt. 56.1 Ctr. Stmt. ¶ 42.

CC resides approximately five to six blocks away from MS's residence. *Id.* at ¶ 44. McSweeney testified that when she and her daughter MS were about to go trick-or-treating, her daughter advised her that CC was outside; MS then went into the house and was told to stay there by her mother. *Id.* at ¶ 45, Exh. C, Tr. McSweeney 52:5-13. In addition, McSweeney testified that she gave CC candy and told him to move along. *Id.* at ¶ 46, Exh. C, Tr. 52:19-22.

On the same day that plaintiffs sent the November 29, 2007 email, Vann received an

email from MS's teacher, Danchalski, which indicated that MS's parents were upset because CC continued to bully MS. *Id.* at ¶ 47. Out of concern for MS, Vann met with her the following day at which time MS advised Vann that CC continued to call her names such as "tattle-tail" and "snippy-pippy" and had asked MS, in the school hallway, if she wanted to buy crack. *Id.* at ¶¶ 48, 49. When the incident occurred, MS did not tell her teacher. *Id.* at ¶ 51. MS did not know what CC meant by "crack" at the time he spoke to her and she had responded by walking away. *Id.* at ¶ 55. MS's parents advised her that crack was a drug and to just ignore CC. Def. 56.1 Stmt. ¶ 57; Exh. E, Tr. MS 31:22-25. Defendants contend that although MS dreamt that CC threatened to put drugs in her drink, CC did not actually make such a threat. Defendants' citation to MS's testimony, however, states nothing about this event. *Id.* at ¶ 56, Tr. MS 25:2-25. MS testified that CC not only asked her if she wanted to buy crack, he also threatened, subsequent to the incident, to put crack into her water bottle.[2] Plt. 56.1 Ctr. Stmt. ¶ 55. MS testified that she had some dreams that CC put crack in her beverage, which she would then drink and die. *Id.* at ¶ 56.

With regard to the alleged name calling, MS could not remember whether she told her teacher that CC was calling her names. *Id.* at ¶ 52. As to CC allegedly bumping into MS, MS testified that CC "bumped into me at recess" in addition to the "time he bumped into [MS] . . . when he was walking backwards" and did not see her. *Id.* at ¶ 53, Exh. F, Tr. MS 182:16-21. MS also testified that after CC was moved into another classroom, CC "bumped" into her numerous times, but that she never complained to anyone at the school. *Id.* at 183:21-25.

---

2. Plaintiffs' citation at paragraph 55 cites to the incorrect exhibit in their Local Rule 56.1(b) statement. Given, however, that they basically repeat the same information in the next paragraph which contains the proper citation, the Court will admit the statement.

McSweeney testified that besides speaking to MS's teacher one time about the bumping, she did not tell anyone else at the school and was satisfied with MS's teacher's response. Def. 56.1 Stmt. ¶ 54, Exh. C, Tr. McSweeney 28:15-24; 30:8-14.

When Vann met with MS on November 30, 2007, MS advised her that she was anxious as a result of being teased by her own friends, Ryan and Kelly. *Id.* at ¶ 58. Vann asked school psychologist, Dr. Saylor, to attend the meeting given MS's anxiety level. *Id.* at ¶ 59. Vann also called MS's mother on November 30 in the afternoon; it was during that telephone call that Vann learned about the letter to the Superintendent dated November 29, 2007. *Id.* at ¶¶ 60, 61. Vann requested that MS's parents come to her office to discuss all of MS's problems, including the issues she was having with CC and with her girlfriends. *Id.* at ¶ 62.

On the following Monday, December 3, 2007, a meeting was held with Dr. Saylor (school psychologist), Brian Smith (MS's father), Debra McSweeney (MS's mother) and Principal Vann. *Id.* at ¶ 63. Vann suggested that MS meet with the school psychologist concerning her anxiety, but McSweeney declined. *Id.* at ¶ 64. As a result of the meeting and to help eliminate the bullying, it was decided that: (1) MS would write down any incidents in her agenda and share them with her teacher; (2) the teacher would so advise Vann; (3) Vann would contact all people having a supervisory role over CC and MS and advise them that MS's parents had complained of ongoing verbal harassment directed at MS and that, to the greatest extent possible, CC and MS not be allowed to interact without supervision; and (4) any incidents of harassment were to be reported to Vann. *Id.* at ¶ 65.

Also on that day, Vann issued a memorandum to MS's and CC's teacher, all special area teachers as well as all teaching assistants and aides for the purpose of notifying all supervisory

individuals of the concerns regarding CC and advising them that they should be "extra diligent" in observing the interactions between the two students and that Vann should be notified "immediately" of any aggressive or inappropriate behavior. *Id.* at ¶¶ 66, 67. In addition, Vann contacted CC's parents on the same day and advised them that CC had asked MS if she wanted to buy crack. *Id.* at ¶ 68. Vann also spoke to CC on that day who admitted asking MS "do you want to buy crack?" *Id.* at ¶ 69. CC, who is nine years old, advised Vann that he was copying something he saw on the internet site "YouTube" which he found amusing. *Id.* at ¶ 70. CC received two days of lunch detention and was advised about the inappropriateness of discussing drugs in the school setting. *Id.* at ¶ 71.

At the December 3, 2007 meeting, MS's parents indicated that they did not want MS removed from the class because they thought such an action would amount to punishing their daughter. *Id.* at ¶ 72. MS's mother, however, wanted CC removed from the class but Vann determined that the incidents were happening outside of the classroom and it was not appropriate for either of the nine year old children to be moved into another classroom at that time. *Id.* at ¶ 73.

After the meeting held on December 3, 2007, Vann wrote to MS's parents to confirm the meeting and what actions would be taken to end the alleged bullying. *Id.* at ¶ 74. On December 10, 2007, Vann was informed that during class, CC told the class not to choose MS to answer a question during class review. MS gave Vann her agenda to allow Vann to see if any other incidents had taken place between the two children. The agenda contained four incidents, including the incident with the class review and as a result, CC received an additional day of lunch detention because he had been instructed to avoid MS. *Id.* at ¶ 75.

### 4.  Fourth Claimed Incident

No other incidents were reported to the school until January 3, 2008 when MS, told her teacher, Danchalski, that CC threatened to slit her throat.  Another student overheard the conversation as well.  *Id.* at ¶¶ 76, 77.  Danchalski first testified that MS advised her of CC's comment "after recess or at the end of the day."  *Id.* at Exh. K, Tr. Danchalski 76:4-5.  She also testified that she immediately reported the incident to Vann.  *Id.* at ¶ 78.

Vann and Dr. Saylor met briefly with the student who had overheard the comment and who confirmed that CC had made the statement.  *Id.* at ¶ 80.  The student reported that CC made the comment in response to a conflict between CC and another girl, Kelly, who had been arguing on behalf of MS because MS was not allowed to speak directly to CC.  *Id.* at ¶ 81.  Vann contacted MS's mother McSweeney on that day so they could speak to MS together whereupon they all met and MS retold the story.  *Id.* at ¶¶ 82, 83.

The next day, Vann met with CC's parents and informed them of the situation.  *Id.* at ¶ 84.  Vann also spoke to CC and CC responded that he was mimicking a movie called "300" when he made the comment.  CC was spoken to about the seriousness of using violent language in a school setting and advised that it would not be tolerated under any circumstances.  *Id.* at ¶ 85.  Vann also informed CC that the situation was worsened by the fact that he made the comment in front of MS, who already felt harassed by CC.  *Id.* at ¶ 86.  CC, who was nine years old at the time, was suspended for two days and removed from the classroom.  *Id.* at ¶¶ 87, 88.

After CC returned to school following his suspension, McSweeney testified that there was an incident with CC's older brother about which she wrote to CC's mother, but received no response; McSweeney could not say whether the school knew about that incident, which did not

concern CC.  Def. 56.1 Stmt., Exh. C, Tr. McSweeney 98:7-24.

In February 2008, plaintiffs wrote to William J. Lindsay, Suffolk County Legislator, to complain that their daughter was being bullied at the school, a copy of which they purportedly sent to Vann.  Plt. 56.1 Ctr. Stmt., Exh. I.  Plaintiffs contend that as late as June 2008, Vann acknowledged that there were "ongoing issues" between MS and CC.  The evidence offered, however, is Vann's deposition testimony concerning a letter written by Vann on June 17, 2008 and addressed to MS's parents, which does not involve an incident between MS and CC.  Plt. 56.1 Ctr. Stmt., Exh. L, Tr. Vann 76:13-17.  Instead, the letter discusses a situation where MS threatened another student.  *Id.* at Exh. L.

MS testified that after CC was moved to another class, he tried to bump into her a couple of times when he saw her, but was unsuccessful.  She also testified that she did not report the attempts to anyone in the school.  *Id.*, Exh. E, Tr. MS 42:21-43:21.  MS testified that CC had a knife "that flipped up" and is used for camping trips, but could not remember when he had it or for how long and stated that she did not report it to anyone who worked in the school because she "really did not trust them anymore."  Def. 56.1 Stmt., Exh. F., Tr. MS 291:9-23.

### 5.  MS's Fourth Grade School Year

MS testified that she still enjoyed fourth grade although she reported her fear that the same situation could repeat itself in fifth grade.  *Id.* at ¶ 89; Plt. 56.1 Dist. Ctr. Stmt. ¶ 89.  MS received all A's in fourth grade and was in a gifted child program called "PIE" which she attended two days per week.  *Id.* at ¶¶ 94, 95.  She also received an award in Art class.  *Id.* at ¶ 102.

When asked how often MS was absent from school during fourth grade, McSweeney

estimated that MS was absent approximately eight or nine days and was actually ill about five of those days. *Id.*, Exh. C, Tr. McSweeney 108:14-22. She then testified that "[maybe she was out a little more. March she was out ten or [eleven] days." *Id.* at 108:22-24. When asked how many times MS was absent because she was upset, McSweeney testified: "Once we went on vacation. The rest of the time it was she had stomach problems[,] she was anxious. She either had a stomach virus, she was sick." *Id.* at 108:25-109:6. When asked whether MS was absent because of CC, McSweeney testified: "I'm not sure. I'm not sure if her stomach problems were because of [CC] or if they really were stomach problems." *Id.* at 109:7-11. McSweeney ultimately testified that MS missed five or six days of school due to stomach problems. *Id.* at 109:12-14. MS did not miss any days of school due to her anxiety. Plt. 56.1 Ctr. Stmt., Exh. C, Tr. McSweeney 50:2-4.

McSweeney testified that during the time period from September through January of MS's fourth grade school year, MS never saw a pediatrician or any type of medical doctor. Def. 56.1 Stmt., Exh. D, Tr. McSweeney 24:8-20. When asked whether MS ever saw a doctor for her stomachaches, McSweeney responded: "I called him but I explained what I thought it was. He just said if it is a stomach–even stomach virus[,] they don't do anything for the stomach." Plt. 56.1 Ctr. Stmt., Exh. C, Tr. McSweeney 50:11-16. McSweeney also called the doctor at the end of the school year for MS's stomachaches and reported that MS was upset and having a hard time in school. The doctor advised her to "just keep her diet very bland and that was it." *Id.* at 50:18-25. MS's mother also testified that CC never physically harmed MS. Def. 56.1 Stmt. ¶ 97.

MS's parents advised the Superintendent of Schools that MS's teacher, Danchalski, went above and beyond her responsibilities to control the harassment. *Id.* at ¶ 98. CC moved away

and attended another district the following school year.  *Id.* at ¶ 104.

**B.      Plaintiffs' Complaint**

Plaintiffs' complaint alleges, pursuant to 42 U.S.C. § 1983, violations of the

Equal Protection and Due Process Clauses of the Fourteenth Amendment as well as a claim

against defendants as policy makers.  The complaint also alleges violation of 20 U.S.C. § 1681

("Title IX") which prohibits discrimination on the basis of sex.  Finally, the complaint contains a

New York State law negligence claim.

## II.  DISCUSSION

**A.      Legal Standard for Summary Judgment**

A motion for summary judgment may not be granted unless a court determines that there

is "no genuine issue as to any material fact and that the movant is entitled to judgment as a matter

of law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (quoting FRCP 56(c)).

"Summary judgment may be granted if the pleadings, depositions, answers to interrogatories, and

admissions on file, together with the affidavits, if any, show that there is no genuine issue as to

any material fact and that the moving party is entitled to judgment as a matter of law."  *Williams*

*v. R.H. Donnell Corp.*, 368 F.3d 123, 126 (2d Cir. 2004).  The court must resolve all ambiguities

and draw all inferences in favor of the non-moving party.  *Id.*; *Castle Rock Entertainment, Inc. v.*

*Carol Publishing Group*, 150 F.3d 132, 137 (2d Cir. 1998).  "A party opposing a properly

brought motion for summary judgment bears the burden of going beyond the [specific] pleadings,

and 'designating specific facts showing that there is a genuine issue for trial.' "  *Amnesty America*

*v. Town of West Hartford*, 288 F.3d 467, 470 (2d Cir. 2002) (quoting *Celotex Corp. v. Catrett*,

477 U.S. 317, 324 (1986)).  If there is any evidence in the record from which a reasonable

inference may be drawn in favor of the non-moving party on a material issue of fact, summary

judgment is improper. *Chambers v. TRM Copy Centers Corp.*, 43 F.3d 29, 37 (2d Cir. 1994).

There is a "genuine" issue of fact only if the "evidence [presented] is such that a

reasonable jury could return a verdict for the nonmoving party." *Giodano v. City of New York*,

274 F.3d 740, 746-47 (2d Cir. 2001). Plaintiff's evidence may not amount to a

mischaracterization of facts because "attempts to twist the record do not create a genuine issue of

material fact for a jury." *Kim v. Son*, No. 05 Civ. 1262, 2007 WL 1989473, at *6 (E.D.N.Y. July

9, 2007). Therefore, "where the cited materials do not support the factual assertions in the

Statements, the Court is free to disregard the assertion." *Holtz v. Rockefeller & Co.,* 258 F.3d 62,

73 (2d Cir. 2001). Also, "conclusory statements, conjecture, or speculation by the party resisting

the motion will not defeat summary judgment." *Kulak v. City of New York*, 88 F.3d 63, 71 (2d

Cir. 1996). Finally, Federal Rule of Civil Procedure 56(c) mandates that all facts under

consideration in a motion for summary judgment be directly supported by proof in admissible

form.

**B.      Plaintiffs' 42 U.S.C. § 1983 Claim**s

Pursuant to 42 U.S.C. § 1983:

> Every person who, under color of any statute, ordinance, regulation, custom, or
> usage, of any State or Territory or the District of Columbia, subjects, or causes to
> be subjected, any citizen of the United States or other person within the
> jurisdiction thereof to the deprivation of any rights, privileges, or immunities
> secured by the Constitution and laws, shall be liable to the party injured in an
> action at law, suit in equity, or other proper proceeding for redress . . . .

"The text of the statute purports to create a damages remedy against every state official for the

violation of any person's federal constitutional or statutory rights." *Kalina v. Fletcher*, 522 U.S.

118, 123 (1997) (citing 42 U.S.C. § 1983). Section 1983 "provides a mechanism for enforcing individual rights "secured" elsewhere, *i.e.*, rights independently "secured by the Constitution and laws" of the United States." *Gonzaga University v. Doe*, 536 U.S. 273, 285 (2002). " '[O]ne cannot go into court and claim a 'violation of § 1983' for § 1983 by itself does not protect anyone against anything.' " *Id.* (quoting *Chapman v. Houston Welfare Rights Org.*, 441 U.S. 600, 617 (1979)). *See Chapman*, 441 U.S. at 618 ("Standing alone, § 1983 clearly provides no protection for civil rights since . . . §1983 does not provide any substantive rights at all.").

Section 1983 was created to "deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails." *Sybalski v. Independent Group Home Living Program, Inc.*, 546 F.3d 255, 257 (2d Cir. 2008) (citing *Carey v. Piphus*, 435 U.S. 247, 254-57 (1978)). "Because the United States Constitution regulates only the Government, not private parties, a litigant claiming that his constitutional rights have been violated must first establish that the challenged conduct constitutes 'state action.' " *United States v. Int'l Bhd. of Teamsters*, *Chauffeurs, Warehousemen & Helpers of Am.*, 941 F.2d 1292, 1295-96 (2d Cir. 1991) (citing *Blum v. Yaretsky*, 457 U.S. 991, 1003 (1982)). *See Sybalski*, 546 F.3d at 257 (holding that plaintiffs claiming violations of their constitutional rights pursuant to § 1983 are required to show state action).

Accordingly, "[b]y the plain terms of § 1983, two-and only two-allegations are required in order to state a cause of action under that statute. First, the plaintiff must allege that some person has deprived him of a federal right. Second, he must allege that the person who has deprived him of that right acted under color of state or territorial law." *Gomez v. Toledo*, 446 U.S. 635, 640 (1980) (citing *Monroe v. Pape*, 365 U.S. 167, 171 (1961)).

1.      **Plaintiffs' Equal Protection Claim**

Plaintiffs' first claim alleges that defendants, acting under color of state law, deprived

"Plaintiffs of rights, equal protection, privileges and immunities secured by the Constitution."

Def. 56.1 Stmt., Exh. A at ¶ 123.

The Fourteenth Amendment provides, in pertinent part:

> All persons born or naturalized in the United States, and subject to the
> jurisdiction thereof, are citizens of the United States and of the State
> wherein they reside. No State shall make or enforce any law which shall
> abridge the privileges or immunities of citizens of the United States; nor
> shall any State deprive any person of life, liberty, or property, without due
> process of law; nor deny to any person within its jurisdiction the equal
> protection of the laws.

U.S. Const. Amend. XIV, § 1.

"The Equal Protection Clause of the Fourteenth Amendment commands that no State

shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is

essentially a direction that all persons similarly situated should be treated alike." *City of*

*Cleburne, Texas v. Cleburne Living Center*, 473 U.S. 432, 439 (1985) (quoting *Phlyer v. Doe*,

457 U.S. 202, 216 (1982)).  In light of the Clause's purpose to " 'secure every person within the

State's jurisdiction against intentional or arbitrary discrimination, whether occasioned by express

terms of a statute or by its improper execution through duly constituted agents,' " *Village of*

*Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (quoting *Sioux City Bridge Co. v. Dakota*

*County*, 260 U.S. 441, 445 (1923)),  the Supreme Court has recognized that "successful equal

protection claims [may be] brought by a 'class of one.' " *Id.*

To state an equal protection claim for a class of one, a plaintiff must allege that he or she

has "been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Id.* (citing cases). The Second Circuit Court of Appeals has held that "in order to succeed on a "class of one" claim, the similarity between plaintiffs and the persons with whom they compare themselves must be extremely high." *Neilson v. D'Angelis*, 409 F.3d 100,104 (2d Cir. 2005) *rev'd on other grounds*, *Appel v. Spiridon*, 531 F.3d 138, 141 (2d Cir. 2008).

There is no dispute that defendants are all state actors for the purposes of § 1983. Turning to plaintiffs' equal protection claim, it is unsupported by the record. First, the complaint does not allege that MS was treated differently than similarly situated students and nor does it appear that discovery unearthed such students. Furthermore, plaintiffs' memorandum in opposition does not contain any arguments in support of an equal protection claim and accordingly, defendants' motion for summary judgment on this claim is granted and that portion of plaintiffs' complaint is dismissed with prejudice.

**2.      Plaintiffs' Due Process Claim**

Based on their use of the phrase "deliberately indifferent" in their complaint and by the arguments in their opposition papers, plaintiffs also bring a substantive due process claim. Def. 56.1 Stmt., Exh. A at ¶ 124; Mem. in Opp. at pp. 16-17.

To prevail on a substantive due process claim, a plaintiff must prove that the conduct at issue was so extreme or egregious that it is fairly viewed as so " 'brutal' and 'offensive to human dignity' " that it shocks the conscience. *Yap v. Oceanside Union Free School Dist*., 303 F. Supp. 2d 284, 296 (E.D.N.Y. 2004) (quoting *Johnson v. Glick*, 481 F.2d 1028, 1033 n.6 (2d Cir.

1973)).  *See Smith ex rel. Smith v. Half Hollow Hills Cent. School Dist*., 298 F.3d 168, 173 (2d

Cir. 2002) ("The protections of substantive due process are available only against egregious

conduct which goes beyond merely " 'offend[ing] some fastidious squeamishness or private

sentimentalism' " and can fairly be viewed as so " 'brutal' and 'offensive to human dignity' " as

to shock the conscience.") (quoting *Johnson*, 481 F.2d at 1033 n.6).  Thus, substantive due

process "protects individuals against government action that is arbitrary, conscience shocking, or

oppressive in a constitutional sense, but not against government action that is 'incorrect or ill-

advised.' " *Lowrance v. Achtyl*, 20 F.3d 529, 537 (2d Cir. 1994) (internal citations omitted).

     In support of their due process claim, plaintiffs argue that defendant Vann made decisions

which "were ineffectual in remedying the bullying situation."  Mem. in Opp. at p. 17. The record,

however, shows otherwise.

     After the first time MS's mother called the teacher, Danchalski, to complain, the teacher

separated the two students, who previously sat together.  MS's mother testified that she was

satisfied with this resolution.

     The next incident occurred on September 18, 2007 at the end of the school day.  MS

claimed that CC told her he was going to shoot her in the head.  MS reported this statement to the

teacher Danchalski, who reported it to principal Vann.  Vann investigated the incident

immediately by speaking with plaintiff's mother, calling the mother of MS's friend and by

speaking to all of the children involved.  The friend's mother stated that, according to her

daughter, CC had said he was going to "egg" the girls' houses on Halloween and shoot them in

the head with an air or toy gun.  Vann also held a meeting with CC, his mother and the school

psychologist and CC was given lunch detention.

On November 29, 2007, MS's mother sent a letter to the district's Superintendent to advise him that on Halloween, CC had come to plaintiffs' house, located off of school grounds, and was disruptive. On the day the letter was sent, MS's teacher Danchalski emailed Vann to advise her that MS's parents were upset that CC continued bullying her. The very next day, Vann spoke to MS who advised Vann that CC had called her names and asked her if she wanted to buy crack. MS also told Vann that she was feeling anxious as a result of being teased by her girlfriends, Ryan and Kelly. When Vann called MS's mother to discuss MS's anxiety on November 30th, Vann found out about the November 29th letter and scheduled a meeting with the mother for the following school day, Monday, December 3, 2007, which also included the school psychologist, MS's parents and Principal Vann. It was suggested that MS meet with Dr. Saylor to help her with the anxiety caused not only by CC but also from being teased by her friends, which the parents declined. At the meeting, a system for reporting any bullying against MS by CC was implemented and all pertinent staff were advised to monitor MS's and CC's interactions with each other.

On January 3, 2008, MS advised her teacher that CC threatened to slit her throat. This comment was made while another student was talking to CC on MS's behalf because MS was not permitted to speak directly to CC.[3] Vann immediately contacted MS's mother and met with her and MS that day. The next day, Vann met with and discussed the situation with CC's parents. CC was then suspended for two days and transferred to another classroom.

---

4.  That MS would communicate with CC, by another classmate or directly, is at odds with her reported fear of him. Furthermore, had MS not been communicating with CC, the throat slitting comment may not have happened at all.

After January 2008, MS testified that CC unsuccessfully tried to bump into her a couple of times, which was not reported to the school. She also testified that CC had an object that sounds like a pocket knife, which information also went unreported to the school. While plaintiffs make much of their correspondence from County Legislator William J. Lindsay as proof of ongoing bullying about which the school knew but did nothing, the letter is addressed to the parents and acknowledges that the parents communicated with Lindsay but does nothing to demonstrate that the school was advised of ongoing problems between CC and MS.

While there is no express formula to determine whether a student's substantive due process rights have been violated, it is beyond dispute that the government official's conduct must be sufficiently egregious for the government to be liable. The Second Circuit Court of Appeals has held that a single slap to the face of a student by a teacher did not shock the conscience. *See Smith*, 298 F.3d at 173 ("[N]ot all wrongs perpetrated by a government actor violate due process.").

On the other hand, in *Johnson v. Newburgh Enlarged School District*, the Second Circuit affirmed the district court's denial of qualified immunity for a teacher who was alleged to have grabbed a student by the throat, lifted him off the ground by his neck, dragged him across the floor, choked him and slammed his head into the bleachers four times before ramming his forehead into a metal fuse box located on the gym wall. 239 F.3d 246, 249 (2d Cir. 2001).

Considering all of the foregoing and the actions taken by the school in response to MS's complaints about CC, there is nothing in the record which demonstrates that any of the defendants' responses to the situations violated MS's substantive due process rights. Moreover,

the record contains no evidence that MS suffered damages of constitutional proportional because of CC's actions and defendants' alleged failure to rectify the situation given that she never saw a doctor during the school year because of CC and did not have excessive absences or poor grades. Therefore, it cannot be said that defendants' conduct was so shocking or brutal that it rose to a due process violation. Accordingly, defendants' motion for summary judgment on plaintiffs' due process claim is granted and the claim is dismissed.

### 3.       Plaintiffs' *Monell* Claim

Pursuant to *Monell v. Department of Social Services*, 436 U.S. 658, 690 (1978), "[l]ocal governing bodies . . . can be sued directly under § 1983 for monetary, declaratory, or injunctive relief where, as here, the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." In *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480-81 (1986), the Supreme Court broadened the concept of municipal liability by holding that while " 'official policy' often refers to formal rules or understandings . . . that are intended to, and do, establish fixed plans of action to be followed . . . consistently and over time," a municipality "frequently chooses a course of action tailored to a particular situation and not intended to control decisions in later situations. If the decision to adopt that particular course of action is properly made by that government's authorized decisionmakers, it surely represents an act of official government 'policy' as that term is commonly understood."

To establish the existence of a municipal policy, therefore, a plaintiff does not have to demonstrate that the municipality repeatedly engaged in a particular course of action; "rather, a

single action taken by a municipality is sufficient to expose it to liability." *Amnesty America v. Town of West Hartford*, 361 F.3d 113, 125 (2d Cir. 2004) ("[E]ven a single action by a decision maker 'who possesses final authority to establish municipal policy with respect to the action ordered,' is sufficient to implicate the municipality in the constitutional deprivation for the purpose of § 1983.") (quoting *Pembaur*, 475 U.S. at 481-82).

"Demonstrating that the municipality itself caused or is implicated in the constitutional violation is the touchstone of establishing that a municipality can be held liable for unconstitutional actions taken by municipal employees." *Amnesty America*, 361 F.3d at 125. *See Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003) ("To establish the liability of a supervisory official under § 1983, a plaintiff must show the defendant's personal involvement in the alleged constitutional violations."); *Green v. Bauvi*, 46 F.3d 189, 194 (2d Cir. 1995) ("In order to establish a § 1983 claim for the deprivation of a protected liberty or property interest without due process, a plaintiff must also show that the defendants were personally involved in the unconstitutional conduct. There is no *respondeat superior* liability in § 1983 cases.") (citing *Monell*, 436 U.S. at 691).

Supervisor liability pursuant to § 1983 may be demonstrated by one or more of the following ways: " '(1) actual direct participation in the constitutional violation, (2) failure to remedy a wrong after being informed through a report or appeal, (3) creation of a policy or custom that sanctioned conduct amounting to a constitutional violation, or allowing such a policy or custom to continue, (4) grossly negligent supervision of subordinates who committed a violation, or (5) failure to act on information indicating that unconstitutional acts were occurring.' " *Goord*, 347 F.3d at 435 (quoting *Hernandez v. Keane*, 341 F.3d 137, 145 (2d Cir.

2003)).

In opposition to defendants' motion for summary judgment, plaintiffs contend that

Principal Vann functioned as a public official and made decisions which were ineffectual in

remedying the bullying situation. Plaintiffs further argue that despite the ineffectiveness of

Vann's solutions, Vann never chose to institute a new course of action and is therefore liable as a

policy maker pursuant to § 1983.

In the first instance, plaintiffs have not sufficiently demonstrated that Vann was a policy

maker within the meaning of *Monell*. In fact, the record contains correspondence from Vann to

School Superintendent Anthony Annunziato, an email dated September 18, 2007, wherein she

specifically states: "My main concern is just that I follow whatever protocols the district has for

these incidents." Plt. 56.1 Ctr. Stmt., Exh. D. In addition, the ability to suspend students,

relocate their classrooms and handle disciplinary matters within one school hardly constitutes

policy making authority. Rather, it sounds like a proper job description for a school principal.

Assuming, *arguendo*, that Vann was a policy maker, there is simply no evidence that any

of the actions taken violated MS's constitutional rights. Although, clearly, CC's behavior was

less than optimal, it must be remembered that he was a nine year-old child at the time the

incidents took place. The discipline meted out by the school seems appropriate, including the

suspension and relocation of CC to another class away from MS. As the Supreme Court has

held, "courts should refrain from second-guessing the disciplinary decisions made by school

administrators." *Davis v. Monroe County Bd. of Educ.*, 526 U.S. 629, 648 (1999) (citing *New

Jersey v. T.L.O.*, 469 U.S. 325, 342 n.9 (1985)). Accordingly, defendants' motion for summary

judgment on plaintiffs' *Monell* claim is granted and the claim is dismissed.

**C.     Plaintiffs' Title IX Claim**

Pursuant to 20 U.S.C. § 1681(a) ("Title IX"), "no person in the United States shall, on the basis of sex, be excluded from participation and, be denied the benefits of, or be subjected to discrimination under any education program of activity receiving federal financial assistance."  In *Davis v. Monroe County Board of Education*, the Supreme Court held that recipients of federal funds may be liable for damages pursuant to Title IX for student on student *sexual* harassment claims when a plaintiff demonstrates that: (1) he or she was subjected to harassment based on sex; (2) that the sexual harassment was so severe, pervasive, and objectively offensive that it could be said to deprive the plaintiff of access to the educational opportunities or benefits provided by the school; (3) that the recipient of federal funds had actual knowledge of the sexual harassment; and (4) that the recipient was deliberately indifferent to the harassment.  526 U.S. 629, 653 (1999).

"It is well settled that students have a right, under Title IX, to be free from peer-to-peer sexual harassment and damages can lie against a school system in cases of student-to-student sexual harassment where the school acts with deliberate indifference to known acts of harassment."  *Riccio v. New Haven Bd. of Educ.*, 467 F. Supp. 2d 219, 224 (D. Conn. 2006) (citing *Davis*, 526 U.S. at 647).  An educational institution "may be held liable under standards similar to those applied in Title VII claims for sexual harassment" when a student brings a Title

IX claim alleging gender discrimination "based on sexual harassment."[4] *Id.* (citing *Murray v. N.Y.U. College of Dentistry*, 57 F.3d 243, 248 (1995)).

"Damages are not available for simple acts of teasing and name-calling among students. Rather, damages are available only where the harassment constitutes such severe gender-based mistreatment that it has a systemic effect of denying a victim the equal access to education that Title IX is designed to protect." *Doe ex rel. Doe v. Coventry Bd. of Educ.*, 630 F. Supp. 2d 226, 233 (D. Conn. 2009) (citing *Davis*, 526 U.S. at 652-53). *See Davis*, 526 U.S. at 650 (holding that "funding recipients are properly held liable in damages only where they are deliberately indifferent to sexual harassment, of which they have actual knowledge, that is so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school"). The "most obvious example of student-on-student sexual harassment capable of triggering a damages claim would involve the overt, physical deprivation of access to school." *Id.* (citing *Davis*, 526 U.S. at 650). *See Soriano ex rel. Garcia v. Bd. of Educ. of City of New York*, No. 01 Civ. 4961, 2004 WL 2397610, at * 6 (E.D.N.Y. Oct. 27, 2004) ("[P]rivate damages actions under Title IX are limited to cases having a systemic effect of denying the victim equal access to an educational program or activity.") (citing *Davis*, 526 U.S. at 652-53).

When deciding a summary judgment motion, the "situation needs to be viewed as a whole, keeping in mind that students often engage in insults, banter, teasing, shoving, pushing and gender-specific conduct that can be upsetting to the student receiving it, but it does not

---

4. *See Cohen v. Litt*, 906 F. Supp. 957, 964-65 (S.D.N.Y. 1995) (citing *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993), and holding that Title VII is not violated when the conduct at issue is not severe or pervasive enough to create an objectively hostile work environment, i.e., that which a reasonable person would find hostile or abusive).

amount to an actionable Title IX claim." *Riccio*, 467 F. Supp. 2d at 227.

Plaintiffs initially contend that Title IX liability may be found despite a lack of physical sexual contact. Mem. in Opp. at p. 7. They argue that the "year-long pattern of CC's bullying, threats and repeated physical contact with the infant plaintiff MS" was not legitimate nonsexual conduct. Their argument stems from the Department of Education, Office of Civil Rights, Sexual Harassment Guidance Notice's statement that it "is important to recognize that Title IX's prohibition of sexual harassment does not extend to legitimate nonsexual touching or other nonsexual conduct."[5] 62 Fed. Reg. 12034-01, 12038 (1997).

While defendants point out that no such inappropriate sexual touching is even alleged, plaintiffs cite, generally, to their exhibits B (Debra McSweeney's deposition dated July 14, 2008); C (Debra McSweeney's deposition dated March 11, 2010); D (email from Vann to Annunziato); E (MS's deposition dated July 14, 2008); and F (MS's deposition dated October 28, 2009), for the proposition that plaintiffs' testimony provides evidence to the contrary.

Before deciding motions for summary judgment seeking to dismiss a Title IX claim, courts have determined that the conduct at issue had a sexual or gender-based component. *See Doe ex rel. Doe v. Hamden Bd. of Educ.*, No. 06 Civ. 1680, 2008 WL 2113345, at * 7 (D. Conn. May 19, 2008) (holding that issues of fact existed as to school board's alleged deliberate indifference to female student after she was sexually assaulted by a male student); *Ricco*, 467 F.

---

4. The Notice further states: ""For example, a high school athletic coach hugging a student who made a goal or a kindergarten teacher's consoling hug for a child with a skinned knee will not be considered sexual harassment. Similarly, one student's demonstration of a sports maneuver or technique requiring contact with another student will not be considered sexual harassment. However, in some circumstances, nonsexual conduct may take on sexual connotations and may rise to the level of sexual harassment. For example, a teacher's repeatedly hugging and putting his or her arms around students under inappropriate circumstances could create a hostile environment." 62 Fed. Reg. 12034-01, 12038-39 (1997).

Supp. 2d at 226 (issues of fact existed on the question of gender-based harassment where one female student was targeted by other female students who called her a variety of gay-based slurs implying that she was a female homosexual).

What is missing from this record, however, is evidence that CC touched or otherwise sexually harassed MS or harassed her because of her gender. Rather, the record reflects the following with respect to the four incidents. First, CC dropped a book on MS's fingers in the beginning of the fourth graders' school year. At that time, MS's mother McSweeney called MS's teacher and advised her of the book incident and that CC was "bumping" into MS. The students were separated, which satisfied the parents. Next, MS reported that CC said he was going to throw eggs at MS's house on Halloween (as well as another student's) and shoot her in the head. Third, when MS was about to go trick-or-treating with her mother, CC, who resides five or six blocks from MS's house, showed up at MS's residence. MS's mother testified that she gave him candy and told him to move along. There are also allegations that CC bumped into MS numerous times, but she never complained to anyone at the school about these incidents. Finally, plaintiffs allege that CC said he was going to slit MS's throat, while MS was communicating with him by using another student as a go-between. Accepting the allegations as true, none establish that the incidents were of a sexual nature or stemmed from MS's gender.

Even assuming, *arguendo*, that the alleged harassment had a sexual or gender-specific basis, plaintiffs have not shown that the school's response was unreasonable in light of the known circumstances. *See Soriano ex rel. Garcia v. Bd. of Educ. of City of New York*, No. 01 Civ. 4961, 2004 WL 2397610, at * 6 (E.D.N.Y. Oct. 27, 2004). Furthermore, plaintiffs have not demonstrated that CC's conduct was sufficiently severe or pervasive. *See id.* (holding that

fourth-grade female's allegations of two instances of sexual harassment by two different fourth-grade boys nearly six months apart "failed to demonstrate that they rise to the level of pervasive harassment such that [plaintiff] was deprived of "equal access to an institution's resources and opportunities"). Accordingly, defendants' motion for summary judgment on plaintiffs' Title IX claim is granted and the claim is dismissed.

**D.      Plaintiffs' New York State Negligence Claim**

Pursuant to 28 U.S.C. 1367(c)(3), a district court "may decline to exercise supplemental jurisdiction" if "the district court has dismissed all claims over which it has original jurisdiction." Defendants' motion for summary judgment has been granted on all of plaintiff's federal claims, and, therefore, the Court declines to exercise jurisdiction over plaintiff's New York State negligence claim. Thus, that claim is hereby dismissed without prejudice. *See Karmel v. Claiborne, Inc.*, No. 99 Civ. 3608, 2002 WL 1561126, at *4 (S.D.N.Y. 2002) ("Where a court is reluctant to exercise supplemental jurisdiction because of one of the reasons put forth by § 1367(c) or when the interests of judicial economy, convenience, comity and fairness to litigants are not violated by refusing to entertain matters of state law, it should decline supplemental jurisdiction and allow the plaintiff to decide whether or not to pursue the matter in state court.").

## III.   CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment on plaintiffs' Equal Protection (page 14, *supra*), Due Process (page 20, *supra*), Municipal Liability (page 22, *supra*)

and Title IX (page 27, *supra*) claims is hereby **GRANTED**.  Plaintiffs' New York State

negligence claim is dismissed without prejudice.

**SO ORDERED.**

Dated: March 20, 2012
      Central Islip, New York

_____/s/_____
Thomas C. Platt, U.S.D.J.
